# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| MICHAEL GERMANO, On Behalf Of Himself And All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> MICROSOFT CORPORATION, <br><br> Defendant. | Civil Action No. 00-CV-10172-JLT |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## DEFENDANT MICROSOFT CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION TO REMAND

Defendant Microsoft Corporation ("Microsoft") hereby opposes Plaintiff's Motion to Remand this purported class action to the Superior Court of Middlesex County in the Commonwealth of Massachusetts.

The Court should decline to rule on Plaintiff's Motion to Remand until the Judicial Panel on Multidistrict Litigation (the "MDL Panel") decides whether to consolidate this and the nearly sixty related putative class actions currently pending against Microsoft in federal court and transfer them to a single district court. The interests of judicial economy will be served by allowing the transferee court to resolve uniformly the common jurisdiction issues.

This Court in any event has jurisdiction over this action pursuant to 28 U.S.C. § 1332. Contrary to plaintiff's assertion, this case meets the $75,000 amount-in-controversy requirement, and does so in two separate and independent ways, neither of which entails an

impermissible aggregation of the putative class members' claims: First, Microsoft's cost of complying with Plaintiff's requested injunctive relief would exceed $75,000 <u>as to any one plaintiff</u>. Second, Plaintiff's claim that Microsoft must "disgorge" its allegedly "ill-gotten" profits, which indisputably exceed $75,000, is an assertion of a "single collective right"; under First Circuit precedent, the entirety of those profits must be considered the jurisdictional amount in controversy.

## BACKGROUND

### 1. The Procedural Posture of This Case

This case was filed on January 11, 2000, just over two months after the United States District Court for the District of Columbia issued Findings of Fact in *United States v. Microsoft Corp.*, an antitrust action brought by the Department of Justice and the attorneys general of twenty states. Since these findings were issued on November 5, 1999, over one hundred purported class actions have been filed against Microsoft in state and federal courts. The Complaint in this case, as in most of these other cases, incorporates and relies on the District of Columbia District Court's Findings of Fact. Complaint at ¶ 34.

To further the interests of judicial economy, Microsoft and a number of the plaintiffs have asked the MDL Panel to consolidate all of the cases pending in federal court, including this one, and transfer them to a single district court for all pretrial proceedings pursuant to 28 U.S.C. § 1407. The MDL Panel is now scheduled to meet to hear arguments on the consolidation-and-transfer motions on March 30, 2000. If, as seems certain, the MDL Panel transfers and consolidates the putative federal class actions, the transferee court would then be able to resolve all pre-trial matters -- including any threshold jurisdictional matters -- in a

2

consistent, economical manner. *See, e.g., In re Ivy*, 901 F.2d 7, 9 (2d Cir. 1990) ("Once transferred, the jurisdictional objections can be heard and resolved by a single court and reviewed at the appellate level in due course. Consistency as well as economy is thus served.").

Accordingly, on February 3, 2000, Microsoft filed a motion to stay all proceedings in this action, including the disposition of Plaintiff's motion to remand, so that the transferee court can determine the issue of subject matter jurisdiction. Numerous federal courts entertaining putative class actions against Microsoft similar to this one have already granted such motions to stay, explicitly acknowledging the desirability of uniform disposition of the jurisdictional issues on the transferee court.[1] Because the Court has not yet ruled on the motion to stay, however, Microsoft is filing this opposition to Plaintiff's motion to remand.

2.      **The Complaint**

Plaintiff filed this purported class action in Middlesex Superior Court on January 11, 2000, and served Microsoft on January 19, 2000. On January 28, 2000, Microsoft removed the action to this Court based on diversity of citizenship.

According to the Complaint, Plaintiff Michael Germano is a resident of the Commonwealth of Massachusetts. Complaint at ¶ 5. Microsoft is a corporation organized under the laws of the State of Washington, with its principal place of business located at One

---

[1]     *See, e.g., Mims v. Microsoft Corp.*, No. 99-2245, at 2 (D. Ariz. Feb. 9, 2000) ("Because Plaintiffs' jurisdictional challenges pose questions likely to be considered in many of the other districts in which similar actions are pending, the Court finds that consideration of these issues by the [MDL Panel] fosters the purposes contemplated by the [MDL Panel].") (attached as Exhibit A); *Brems v. Microsoft Corp.*, No. C-00-0006, at 5 (N.D. Iowa Feb. 3, 2000) ("If the MDL Panel transfers the case, the transferee court can rule expeditiously on the challenge to subject matter jurisdiction in this case and any similar cases. Transfer is thus the most efficient and effective use of judicial resources.") (attached as Exhibit B).

3

Microsoft Way, Redmond, Washington. Plaintiff asserts a claim alleging "Common Law Restraint of Trade." Complaint at ¶¶ 37-40. He alleges that Microsoft engaged in numerous anticompetitive activities to protect Microsoft's alleged monopoly power in the markets of "the purchase, lease or licensing of all Intel-compatible PC operating systems" and "the purchase, lease, or licensing of web browsers." Complaint at ¶¶ 28, 31. As relief, Plaintiff seeks damages, restitution and a permanent injunction against Microsoft's allegedly unlawful acts. Complaint at ¶ 41c-d. Further, above and beyond the individual claims for compensatory damages relating to each putative class member's alleged overpayment, Plaintiff seeks recovery from a fund of money consisting of Microsoft's profits by requesting "disgorgement of ill-gotten gains." Complaint at ¶ 41c.

Plaintiff's allegations regarding Microsoft's conduct are both sparse and conclusory. He does allege that "[s]ince the introduction of Internet Explorer, Microsoft has, by unlawful and anticompetitive means, including the monopoly leveraging of its market power in the PC operating systems market, effectively eliminated competition in the web browser and related markets." *Id.* at ¶ 31. Apart from this reference to "monopoly leveraging," Plaintiff provides no further illustrations of, or elaboration upon, the alleged "unlawful and anticompetitive means" to which he refers in his Complaint. He does, however, "incorporate[] by reference" Judge Jackson's Findings of Fact in *United States v. Microsoft Corp.*, --- F. Supp.2d ---, 1999 WL 1456114 (D.D.C. Nov. 5, 1999) (attached as Exhibit C). Complaint at ¶ 34. One of Judge Jackson's findings, which appears crucial to the above allegations regarding the web browser market, is that Microsoft "bundled" Internet Explorer with Windows 98 in order to achieve a monopoly of the web browser market. *See, e.g., id.* at *103, ¶ 376. In his Prayer

4

for Relief, Plaintiff asks the Court to permanently enjoin Microsoft from "continuing, maintaining, or renewing the unfair trade" alleged in the Complaint. *Id.* at ¶ 41d. In sum, the Complaint appears to seek an injunction requiring Microsoft to, *inter alia*, "un-bundle" Windows 98 and Internet Explorer.

### 3. Compliance With the Injunctive Relief Sought by Plaintiff

Microsoft's compliance with the injunction plaintiff seeks would be no small feat. The software code for Internet Explorer included in Windows 98 performs essential operating system functions, wholly unrelated to the Internet, in addition to allowing Internet Explorer to operate. Affidavit of Christopher Jones ("Jones Aff.") at ¶ 4 (attached as Exhibit D). For example, the Windows 98 user interface is generated by the very same software code that enables users to use Internet Explorer to "browse" the World Wide Web. *Id.* ¶ 4. Accordingly, if the software code in Windows 98 that enables users to use Internet Explorer were simply excised, Windows 98 would cease to function. *Id.* Because of this "code sharing," Microsoft cannot offer a version of Windows 98 without Internet Explorer code. *Id.* ¶ 5.

As an alternative to actually removing software code from Windows 98, Microsoft could try to disable the parts of Windows 98 used to access the Internet with Internet Explorer. *Id.* ¶ 5. Such a modified version of Windows 98 would still include the Internet Explorer code, although consumers could not use Internet Explorer. *Id.* But production of even such a modified Windows 98 would still be both time-consuming and costly. *Id.* At least the following tasks would have to be performed:

5

    (a)    Create a detailed specification that identified which features must be disabled.

    (b)    Create a development schedule and assemble an engineering team to implement the plan.

    (c)    Perform the development work.

    (d)    Test the modified operating system to confirm that Internet Explorer had been disabled without affecting other aspects of the operating system or the operation of software applications and hardware devices that interoperate with Windows 98.

    (e)    Update the documentation.

    (f)    Release the modified operating system.

    (g)    Refresh various channels of distribution.

*Id.* ¶ 6. This entire process likely would take in excess of six months and cost far more than $75,000. *Id.* at ¶¶ 5, 6.

The precise cost to Microsoft of implementing these various changes to Windows 98 cannot be estimated with certainty. *Id.* at ¶ 7. Microsoft does know, however, that it took about one year to design, develop, and test Windows 98 Second Edition, a relatively minor update released in the summer of 1999. *Id.* at ¶ 8. That process involved 640 people and cost approximately $58.5 million. *Id.* That amount is a reasonable estimate of what it would cost to comply with a Court order to produce a version of Windows 98 that does not provide users with the ability to browse the World Wide Web. *Id.*

Although not all of the steps described above would have to be taken to produce just a single copy of Windows 98 with Internet Explorer disabled, the cost of producing even one such copy would greatly exceed $75,000. *Id.* ¶ 7.

6

## ARGUMENT

I. **THE COURT SHOULD NOT DECIDE PLAINTIFF'S MOTION TO REMAND BECAUSE THE JURISDICTION ISSUES ARE BEST RESOLVED UNIFORMLY BY A SINGLE FEDERAL DISTRICT COURT.**

As set forth in detail in Microsoft's Memorandum in Support of its Motion to Stay All Proceedings Until the MDL Panel Rules on Motions to Transfer This and Other Actions Pursuant to 28 U.S.C. § 1407 ("Motion to Stay"), where common questions of federal jurisdiction are at issue against the backdrop of a pending MDL proceeding, federal courts ordinarily stay their actions to permit a single district court, *i.e.*, the transferee court designated by the MDL Panel, to decide the common jurisdiction issue. *See* Motion to Stay at 8-10. Numerous district courts entertaining suits against Microsoft similar to this one have already stayed their hand.[2] Earlier this week, the United States District Court for the Southern District of New York granted Microsoft's motions to stay in two related cases and deferred consideration on plaintiffs' motions to remand, holding that "the more prudent course is to

---

[2] *See Pryor v. Microsoft Corp.*, 99-Civ-12161 (VM) (S.D.N.Y. Mar. 13, 2000); *Seastrom v. Microsoft Corp.*, 99-Civ-12162 (VM) (S.D.N.Y. Mar. 13, 2000); *McWhinney v. Microsoft Corp.*, No. 00-428 (W.D. Pa. Mar. 8, 2000); *Kloth v. Microsoft Corp.*, No. C-2-99-1276 (S.D. Ohio Mar. 2, 2000); *Glase v. Microsoft Corp.*, No. 00-334 (N.D. Ohio Mar. 1, 2000); *Cheeseman v. Microsoft Corp.*, Nos. 2:99-CV-396; 2:99-CV-401; 2:99-CV-403 (D. Vt. Feb. 29, 2000); *Pryor v. Microsoft Corp.*, No. 00-165 (WGB) (D.N.J. Feb. 28, 2000); *Nielsen v. Microsoft Corp.*, No. 1:99-2037 (D. Minn. Feb. 28, 2000); *The Rubbright Group v. Microsoft Corp.*, No. 1:99-2017 (D. Minn. Feb. 28, 2000); *O'Neil v. Microsoft Corp.*, No. 99-C-1497 (E.D. Wis. Feb. 18, 2000); *Weinke v. Microsoft Corp.*, No. 99-C-1505 (E.D. Wis. Feb. 18, 2000); *Clark v. Microsoft Corp.*, No. 1-99-1334 (W.D. Tenn. Feb. 17, 2000); *Moscowitz v. Microsoft Corp.*, No. 300-CV-14 (D. Conn. Feb. 16, 2000); *Mims v. Microsoft Corp.*, No. 99-2245 (D. Ariz. Feb. 9, 2000); *D's Pet Supplies, Inc. v. Microsoft Corp.*, Civil Action No. 99-76056 (E.D. Mich. Feb. 8, 2000); *Bach v. Microsoft Corp.*, No. 99-76086 (E.D. Mich. Feb. 8, 2000); *Applegate v. Microsoft Corp.*, No. 99-76202 (E.D. Mich. Feb. 8, 2000); *Fine v. Microsoft Corp.*, No. 00-70481 (E.D. Mich. Feb. 8, 2000); *Tyler v. Microsoft*, No. 99-CV-2602-L (S.D. Cal. Feb. 4, 2000); *Brems v. Microsoft Corp.*, No. C-00-0006 (N.D. Iowa Feb. 3, 2000); *Quigley v. Microsoft Corp.*, C.A. No. 99-3420 (E.D. La. Jan. 14, 2000); *To The Rescue Comprehensive Computer Services v. Microsoft*, No. 99-3301-CIV-JORDAN (S.D. Fla. Jan. 4, 2000); *Campbell v. Microsoft Corp.*, No. 2-99-4165-18 (D.S.C. Jan. 3, 2000); *Cox v. Microsoft Corp.*, C.A. No. 99-PT-3009-E (N.D. Ala. Dec. 27, 1999). Microsoft will provide the Court with a copy of each of the above Orders should the Court find them useful.

7

await the MDL Panel's decision, with the anticipation that a single transferee court may address such jurisdictional challenges, along with other pretrial proceedings, to the extent they present common issues that may require consistency of interpretation and application of law." *Pryor v. Microsoft Corp.*, No. 99 Civ 12161 (VM); *Seastrom Assoc. Ltd. v. Microsoft Corp.*, No. 99 Civ. 12162 (VM) (S.D.N.Y. Mar. 13, 2000) (a copy of the joint Order is attached as Exhibit E).

The prudence of deferring to the transferee court in this context has been fully explained by the Second Circuit in *In re Ivy*, 901 F.2d 7 (2d Cir. 1990). Plaintiffs in that case filed their complaint in Texas state court, but defendants removed the case to federal court and filed a motion to transfer with the MDL Panel. While that motion was pending, plaintiffs filed a motion with the Texas district court to remand the case to state court. The Texas district court refused to rule on plaintiffs' remand motion, deferring instead to the MDL Panel's decision on transfer. The MDL Panel ultimately granted the transfer motion and consolidated the case with several other actions already pending in federal district court in New York. Denying plaintiffs' request for a writ of mandamus, the Court of Appeals for the Second Circuit commended the Texas district court's decision to defer consideration of the plaintiffs' remand motion so that the issue of jurisdiction could be considered by the transferee court:

> The jurisdictional issue in question is easily capable of arising in hundreds or even thousands of cases in district courts throughout the nation. That issue, however, involves common questions of law and fact . . . and there are real economies in transferring such cases . . . . Once transferred, the jurisdictional objections can be heard and resolved by a single court and reviewed at the appellate level in due course. Consistency as well as economy is thus served.

901 F.2d at 9 (citations omitted). The Second Circuit's reasoning applies in full force here, and this Court should defer decision on Plaintiff's remand motion.

## II. THE COST TO MICROSOFT OF COMPLYING WITH PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF SATISFIES THE AMOUNT-IN-CONTROVERSY REQUIREMENT.

In cases seeking injunctive relief, the amount-in-controversy requirement is measured by the "object sought to be accomplished by plaintiffs's complaint; the test for determining the amount in controversy is the pecuniary result to either party which the judgment would directly produce." *Berman v. Narragansett Racing Assoc.*, 414 F.2d 311, 314 (1st Cir. 1969) (citing *Ronzio v. Denver & R.G.W.R. Co.*, 116 F.2d 604, 606 (10th Cir. 1940). *See also Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 347 (1977) ("In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation."). Accordingly, in connection with Plaintiff's claim for injunctive relief here, "the value of the object of the litigation" is the pecuniary burden on Microsoft to comply with the injunction plaintiff seeks. As explained above, Microsoft's cost of compliance with the injunctive relief sought in the Complaint would exceed the $75,000 threshold as to any one plaintiff, Jones Aff. at ¶ 7, and therefore, this Court has jurisdiction.

This approach to the amount-in-controversy requirement does not depend on an impermissible "aggregation" of the claims of putative class members. *See, e.g., Zahn v. International Paper Co.*, 414 U.S. 291, 301 (1973). Although Microsoft's approach is based on the "defendant's viewpoint" of the amount in controversy, the First Circuit has left little doubt that such a test is appropriate as long as it does not involve impermissible aggregation.

9

*See Williams v. Kleppe*, 539 F.2d 803, 805 n.1 (1st Cir. 1976) (in action for declaratory relief the court can "rely on the extent of the claimed pecuniary burden on the defendants were plaintiffs to prevail"); *Commonwealth of Massachusetts v. United States Veterans Admin.*, 541 F.2d 119, 122 n.3 (1st Cir. 1976) (amount-in-controversy requirement met because the pecuniary burden on the defendant was probably in excess of the requisite amount). Indeed, in a thorough analysis of the split between the federal circuit courts of appeal on the issue of whether it is proper to measure the amount in controversy from the viewpoint of the defendant, the United States District Court for the Middle District of North Carolina noted that the First Circuit follows the "more recent trend" which focuses the analysis on the cost to defendant. *Hoffman v. Vulcan Materials Co.*, 19 F. Supp.2d, 475 480 (M.D.N.C. 1998). *See also Berman*, 414 F.2d at 314 (noting that applicable test is to look at the pecuniary burden on either party).

This Court has previously discussed the *Williams* and *United States Veterans Administration* cases in acknowledging that the First Circuit has endorsed the defendant's-viewpoint approach to the jurisdictional amount. *Hairston v. Home Loan and Investment Bank*, 814 F. Supp. 180, 182 (D. Mass. 1993). In *Hairston*, the Court did not find the defendant's viewpoint dispositive because "unlike the situations in *Williams* and *United States Veterans Administration*, the potential damage to defendants here is speculative and unpredictable." 814 F. Supp. at 182. The Court stated, however, that "the defendant's viewpoint rule" might be adopted in an "appropriate situation."[3] *Id.* This case is such a

---

[3] In *Hairston*, this Court discussed then-District Court Judge Selya's opinion in *Ferris v. General*
(continued...)

situation. Here, as in *Williams* and *United States Veterans Administration*, Microsoft has come forward with strong evidence that the pecuniary burden of an injunction would far exceed the $75,000 threshold as to any one plaintiff. *See* Jones Aff. at ¶ 7. *Grotzke v. Kurz*, 887 F. Supp. 53, 56-57 (D.R.I. 1995) (holding amount in controversy satisfied based on pecuniary burden on defendant and basing its decision to utilize "defendant's viewpoint" on "clear trend" noted by commentators and numerous occasions in which First Circuit has opined in favor of this approach).[4]

A recent case from the Seventh Circuit demonstrates that the amount-in-controversy requirement is satisfied here -- in the putative class action context -- under this "cost of compliance" analysis. *In re Brand Names Prescription Drugs Antitrust Litig.*, 123 F.3d 599 (7th Cir. 1997). *Prescription Drugs* involved the consolidation of hundreds of separate cases (including several class actions) in which the plaintiffs asserted antitrust claims against

---

[3](...continued)
*Dynamics Corp.*, 645 F. Supp. 1354, 1362 (D.R.I. 1986), in which Judge Selya noted that "courts have discarded a strict 'plaintiff's viewpoint' rule and looked to the value of the claim from the defendant's vantage." 814 F. Supp. at 181 n.2. Judge Selya, however, declined to use the defendant viewpoint approach under the particular facts of that class action. 645 F. Supp. at 1362-63. He stated that to do so would "circumvent the well-established rule that the claims of class members cannot be aggregated for the purpose of meeting [the] jurisdictional amount." 645 F. Supp. at 1363. As set forth more fully below, and in the attached Affidavit of Christopher Jones, the non-aggregation principle is not violated here because Microsoft's cost of compliance as to any one plaintiff exceeds $75,000. Accordingly, finding the amount-in-controversy requirement satisfied in this case squares with Judge Selya's analysis in *Ferris*.

[4] Plaintiff's reliance on *Ciardi v. F. Hoffmann-La Roche, Ltd.*, No. 99-11936-GAO (D. Mass. Feb. 7, 2000), for the proposition that the amount in controversy must be viewed from the plaintiff's viewpoint, is misplaced. Memorandum in Support of Motion to Remand at 7. Defendants in that action attempted to invoke jurisdiction not by looking at the amount in controversy from the viewpoint of the defendant, but by aggregating the potential award of attorneys' fees potentially recoverable by plaintiffs. *See Ciardi*, No. 99-11936-GAO at 2. The court held that this attempt -- which focused on the amount in controversy from the plaintiff's perspective -- was improper because it violated the anti-aggregation principle of *Zahn*. *Id.* at 5. As set forth above, Microsoft does not contend that the cost of its compliance should be aggregated among the putative class members. For any single plaintiff, Microsoft's cost of compliance with the requested injunction would exceed $75,000.

11

manufacturers and wholesalers of prescription drugs. Among other things, plaintiffs sought an injunction requiring defendant drug manufacturers and wholesalers to end an alleged conspiracy in which they denied plaintiff pharmacies discounts off the list price of brand-name drugs that the manufacturers sold to the wholesalers and that the wholesalers then sold to the pharmacies. *Id.* at 602. After defendants removed the action to federal district court, plaintiff sought remand, arguing that the amount-in-controversy requirement had not been met. *Id.* at 607. The district court denied plaintiff's motion. Writing for the Court of Appeals, Judge Posner analyzed the amount-in-controversy requirement in the context of class actions where injunctive relief is requested, and stated that "[l]ooked at from the defendants' standpoint, the minimum amount in controversy would be present if the injunction sought by the plaintiffs would require some alteration in the defendant's method of doing business that would cost the defendant at least the statutory amount." *Id.* at 609.[5] The Court explained why such a "cost of compliance" approach is perfectly consistent with the general rule that the claims of individual class members cannot be aggregated to satisfy the amount in controversy.

> Whatever the form of relief sought, each plaintiff's claim must be held separate from each other plaintiff's claim from both the plaintiff's and the defendant's standpoint. The defendant in such a case is deemed to face multiple claims for injunctive relief, each of which must be separately evaluated. (citation omitted). The question then becomes, as with the penalty statute, whether each plaintiff is asserting an individual right or, rather, a right to an undivided interest in something. In this case it is the former. Each plaintiff has a right to be free from the indirect effects of

---

[5] The Seventh Circuit held that the amount-in-controversy requirement was not satisfied because the "grant of an injunction in favor of a single plaintiff would be unlikely to impose a heavy cost on any of the defendants...." *Id.* No such obstacle stands in the way of federal jurisdiction here because, as clearly stated in the accompanying affidavit of Christopher Jones, an injunction in favor of a single plaintiff here easily clears the $75,000 hurdle. Jones Aff. at ¶ 7.

12


> collusive pricing. . . . <u>The test, we repeat, is the cost to each defendant of an injunction running in favor of one plaintiff, otherwise the nonaggregation rule would be violated.</u>

*Id.* at 610.

The Seventh Circuit's reasoning applies here in full force. As in *Prescription Drugs*, each putative class member is asserting an individual right to be "free from the indirect effects" of Microsoft's alleged unfair practices. Thus, the relevant test is the cost to Microsoft of "an injunction running in favor of one plaintiff." *Id.* at 610. Accordingly, because the cost to Microsoft of complying with the injunctive relief that Plaintiff seeks easily exceeds the $75,000 threshold as to <u>any one plaintiff</u>, the amount-in-controversy requirement is met. Jones Aff. at ¶ 7. *See also Hoffman*, 19 F. Supp.2d 475, 481 (M.D.N.C. 1998) (relying on *Prescription Drugs* analysis and holding amount in controversy satisfied where injunction sought by one plaintiff would cost defendant substantially more than jurisdictional minimum and deeming nonaggregation rule complied with because "defendant will sustain this loss even if only one plaintiff were to obtain the injunction").[6]

---

[6] On March 8, 2000, the United States District Court for the District of Maine granted plaintiffs' motion to remand one of the related putative class actions against Microsoft. *See Melnick v. Microsoft Corp.*, No. 99-377-P-H, slip op., (D. Me. Mar. 8, 2000) (attached as Exhibit F). The court based its decision to remand on the erroneous assumption, among others, that the amount in controversy must be viewed from the plaintiff's perspective. Microsoft submits that the court simply came to the wrong conclusion regarding its diversity jurisdiction.

First, the *Melnick* court stated that "[t]he Supreme Court has consistently made clear that the proper measure in determining the amount in controversy in injunction cases 'is to be tested by the value of the object to be gained by complainant.'" *Id.* at 2 (quoting *Glenwood Light & Water Co. v. Mutual Light, Heat & Power Co.*, 239 U.S. 121, 125 (1915) and citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 347 (1977); *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 181 (1936); *Local 714 v. Greater Portland Transit Dist.*, 589 F.2d 1, 10 (1st Cir. 1978)). Only the Supreme Court's 1915 decision in *Glenwood*, however, contains this language. All of the subsequent cases cited omit the language that restricts the amount-in-controversy determination to the "value of the object to be gained by complainant;" instead they speak in terms of the "value of the object of the litigation." *See, e.g., Hunt*, 432 U.S. at 347; *Local 714*, 589 F.2d at 10 (*rev'd*

(continued...)

13

## III. PLAINTIFF'S CLAIM FOR DISGORGEMENT SATISFIES THE AMOUNT-IN-CONTROVERSY REQUIREMENT.

Diversity jurisdiction is proper for the separate and independent reason that Plaintiff's claim for disgorgement asserts what the First Circuit has described as an "integrated right," rather than a separate and distinct claim for compensatory relief. *Berman v. Narragansett Racing Assoc.*, 414 F.2d 311, 314 (1st Cir. 1969). *See Snyder v. Harris*, 394 U.S. 332, 335 (1969). Disgorgement is an equitable remedy measured not by any single plaintiff's loss, but by the defendant's allegedly inequitable gain. *See S.E.C. v. Williams*, 884 F. Supp. 28, 30 (D. Mass. 1995) ("disgorgement actions [are] designed to deprive a defendant of 'ill-gotten'

---

[6](...continued)
on other grounds in *Jackson Transit Auth. v. Local Div. 1285*, 485 U.S. 15 (1982)). Accordingly, the *Melnick* court's apparent belief that a plaintiff's-only viewpoint approach reflects "existing Supreme Court precedent," No. 99-377-P-H at 2, is simply wrong. *See Hoffman v. Vulcan Materials Co.*, 19 F. Supp.2d 475, 480 (M.D.N.C. 1998). "Courts which utilize the plaintiff-viewpoint rule are, of course, unable to cite to a Supreme Court decision that directly mandates it." *Id.* (calling reliance on *Glenwood* "strained" as support for this proposition).

Second, the *Melnick* court failed properly to acknowledge First Circuit precedent demonstrating that the amount in controversy can be measured from the defendant's perspective. *Id.* at 2, n.1. The *Melnick* court rejected as "comments made in passing" in *Williams*, 539 F.2d at 804, n.1 and *U.S. Veterans Admin.*, 541 F.2d at 122, n.3, the First Circuit's statements indicating that the defendant-viewpoint rule is proper in measuring the amount in controversy. Indeed, the *Melnick* court stated that such cases cannot be read to "modify existing Supreme Court precedent." As set forth above, however, there is no existing Supreme Court precedent on point, *Hoffman*, 19 F. Supp.2d at 480, and the *Melnick* court therefore erred in rejecting the First Circuit authority. Moreover, the *Melnick* court's remark that the "jurisdictional amount was not an issue" in *U.S. Veterans Admin.*, ignored the language of that case. In upholding federal subject matter jurisdiction, the First Circuit stated that plaintiff's "contentions [that the court had jurisdiction] were apparently raised below, and the parties have briefed and argued the relevant issues here." 541 F.2d at 122. Further, the court's holding that the defendant's pecuniary burden of complying with the cost of the injunctive relief satisfied the amount in controversy was necessary to its ultimate decision that the case must be dismissed on sovereign immunity grounds. *See id.* at 123.

Third, the *Melnick* court misread *Prescription Drugs*. In relying on that case as support for its decision to remand, the court stated that the Seventh Circuit "seems also to suggest that if the defendant's cost is considered, it must then essentially be divided by the number of potential plaintiffs." *Id.* at 2 n.1 (quoting *Prescription Drugs*, 123 F.3d at 609-10). *Prescription Drugs*, however, stands for the exact opposite proposition in this context. "The test, we repeat, is the cost to each defendant of an injunction running in favor of one plaintiff; otherwise the nonaggregation rule would be violated." *Id.* at 610.

14

gains"). It is well-settled that where multiple plaintiffs purport to assert such a common right, the entirety of the disgorged amount is the "amount in controversy." *See Berman*, 414 F.2d at 314.[7]

The United States District Court for the District of Columbia recently considered this issue in a class action alleging antitrust violations. *Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 48 F. Supp.2d 37 (D.D.C. 1999). In *Aetna*, the plaintiffs claimed that, "without reference to any actual damages sustained by any individual plaintiff, defendants must disgorge the profits derived from their illegal anticompetitive activities." *Id.* at 41. The Court concluded that:

> Plaintiff's claim for disgorgement does not depend upon the vindication of individual class members' rights, but instead upon the disgorgement of money alleged to be unlawfully and inequitably held by defendants . . . . Defendants have no interest in how the claim is to be distributed among the class members because, if plaintiff was to prevail on its claim as alleged, the number of plaintiffs to be paid would not reduce or increase the amount of money to be disgorged. <u>Plaintiff's claim for disgorgement must be considered one seeking to recover under a single collective right in which the putative class has a common and undivided interest and therefore may be considered collectively when making the amount-in-controversy determination.</u>

*Id.* at 41-43 (footnotes omitted) (emphasis added). The Court's analysis is equally applicable here, where Plaintiff asserts a virtually identical disgorgement claim.

Plaintiff's anticipatory attempt to distinguish *Aetna* from the current action is unavailing. His first point of argument, that the *Aetna* plaintiffs sought disgorgement of a

---

[7] By contending that Plaintiff's prayer for disgorgement affects the amount in controversy, Microsoft does not intend to concede that under Massachusetts law disgorgement is an available remedy for the claim Plaintiff has asserted or that Plaintiff can force disgorgement of all of Microsoft's alleged "ill-gotten" profits into a common and undivided fund. Those positions -- adopted here for the sake of argument -- follow from the allegations and prayers in Plaintiff's Complaint.

15

specific, quantified fund of $40 million, is the proverbial distinction without a difference. Simply quantifying the alleged overpayment did not convert the profits plaintiff sought to have disgorged into a "specific, identifiable fund" that is meaningfully different from the pool of money Plaintiff's disgorgement claim seeks here, and nowhere did the *Aetna* court indicate that its decision turned on such a triviality. The result if Plaintiff's argument was to control -- which would allow a plaintiff to evade federal jurisdiction simply by omitting the monetary value of the profits he seeks disgorged -- is an absurdity that reads all sense out of the amount-in-controversy requirement.

Plaintiff's second point of distinction -- that the *Aetna* plaintiffs sought disgorgement without any reference to individual claims -- is simply wrong. Just like Plaintiff here, the *Aetna* plaintiffs sought disgorgement, injunctive relief, and damages for the alleged antitrust violations. Id. at 38. That the court chose to spend the bulk of its analysis on the disgorgement claim simply reflects its recognition that the disgorgement claim, standing alone, was sufficient to confer federal diversity jurisdiction over the class, regardless of plaintiff's other theories of recovery. Accordingly, Plaintiff's argument that the *Aetna* case somehow turned on the class members' failure to assert any individual rights is disingenuous and cannot serve as a vehicle to strip this Court of its jurisdiction.[8]

---

[8] Plaintiff relies on a separate district court's opinion involving the same parties for his argument that his disgorgement claim does not seek to recover under a single collective right. *Aetna U.S. Healthcare, Inc. v. Hoechst Aktiengesellschaft*, 54 F. Supp.2d 1042 (D. Kan. 1999). As an initial matter, as recognized by that court itself, its ruling represented the minority view in cases of its type. Id. at 1049 (collecting cases and observing that five of the six courts to face the issue had held that a disgorgement claim created a common and undivided interest). Further, Microsoft submits that the court made an error by equating a collective claim for disgorgement of ill-gotten gains held by a defendant with individual claims for restitution. Accordingly, the minority view espoused by Plaintiff offers no logical support for his position, and the Court should decline to follow it. Likewise, the other cases Plaintiff relies on for the same proposition proceed under the same faulty

(continued...)

16

First Circuit law, which Plaintiff conspicuously ignores, is in accord. *See Berman*, 414 F.2d 311. In *Berman*, numerous horse owners and riders sought to compel payment from certain racing tracks under common ownership for funds alleged to have been unlawfully withheld. Plaintiffs in that case, seeking to invoke federal jurisdiction, conceded that individually their claims did not exceed the amount in controversy. *Id.* at 314. The First Circuit, however, noting that a judgment for plaintiffs would result in the award of several million dollars to the class, held that the amount-in-controversy requirement was satisfied. *Id.* "We think it is the amount of the entire fund, and not what each pursewinner's individual share will eventually be, that determines the amount in controversy here." *Id.* at 314-15.

In holding that the plaintiffs' claims constituted an "integrated right against the defendant," *id.* at 315, the court placed emphasis on the factor that defendants had no interest in the apportionment of the fund. "In cases contemplating distribution of a fund, it has long been settled that one factor of considerable importance on the issue of whether the plaintiffs' interests are aggregable is whether the defendant has an interest in how the fund will be apportioned if plaintiffs prevail." *Id.* at 316 (citing *Gibson v. Shufeldt*, 122 U.S. 27, 30 (1887)).

---

[8](...continued)
premise. In so doing, these various decisions fail to look at the "object sought to be accomplished" by the disgorgement claim -- the relevant test prescribed by the First Circuit -- and therefore fail to inform the analysis. *See Berman v. Narragansett Racing Assoc.*, 414 F.2d 311, 314 (1st Cir. 1969).

This split in authority further highlights why this Court should defer ruling on Plaintiff's remand motion until the MDL Panel decides the consolidation-and-transfer motions. The interests of judicial economy will be served by having one court determine all threshold jurisdictional issues in a consistent manner, rather than having numerous related putative class actions proceed piecemeal.

Here the Complaint prays not only for "damages" -- presumably the amount of any alleged overpayment that plaintiffs made to various original equipment manufacturers -- but also for Microsoft's "disgorgement of ill-gotten gains." While the prayer does not ask specifically that disgorgement create a common and undivided fund in which all potential plaintiffs have an undivided interest, that is the only realistic reading of the request to recover Microsoft's profits. Surely the Complaint does not intend that an individual plaintiff who purchased or leased Microsoft software must tie his alleged overpayment -- his "damages" -- to specific additional profits Microsoft reaped from that transaction.[9] To the contrary, plaintiffs collectively will try to establish a lump sum of all of Microsoft's "ill-gotten gains," and then shares of those gains will be allocated among the class. Under that regime, Microsoft will have no interest in how the disgorged amount is distributed, nor will it be affected by how many potential plaintiffs share in the spoils. It will pay out the same amount regardless of the number of plaintiffs in the putative class. In that sense, as the First Circuit put it, "[t]he interests of the plaintiffs, vis a vis the matter in controversy, are 'common and undivided' and the fact that their interests are separable among themselves is immaterial.'" *Id.* (emphasis

---

[9] In an apparent attempt to rewrite the Complaint to justify remand, Plaintiff states: "[T]he plaintiff and each individual class member did not make overpayments as a group, nor do they seek disgorgement of any specific, identifiable fund. . . . Each class member can only recover to the extent of his or her overpayment." Memorandum in Support of Motion to Remand at 6. If this were true, the request for disgorgement would be mere surplusage. Damages and disgorged profits would be identical. This Court should disregard Plaintiff's efforts to rewrite the Complaint after the fact to defeat federal jurisdiction. Indeed, it is well-settled that once a defendant properly removes a case, the focus is exclusively on the plaintiff's complaint at the time of removal. *See, e.g., St. Paul Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 291 (1938) ("[T]he status of the case as disclosed by the plaintiff's complaint is controlling in the case of removal"); *Coventry Sewage Associates v. Dworkin Realty Co.*, 71 F.3d 1, 4 (1st Cir. 1995) (similar).

added). Plaintiff's disgorgement claim satisfies the amount in controversy and provides this Court with subject matter jurisdiction.

## CONCLUSION

For the foregoing reasons Microsoft respectfully requests that the Court defer from ruling on Plaintiff's Motion to Remand until the MDL Panel makes its decision on consolidation and transfer, or, in the alternative, that the Court deny Plaintiff's motion and retain jurisdiction over this action.

Respectfully submitted,

Attorneys for Defendant

MICROSOFT CORPORATION

*/s/ Douglas S. Brooks*
Paul E. Nemser (BBO #369180)
James C. Rehnquist (BBO #552602)
Douglas S. Brooks (BBO #636697)
GOODWIN, PROCTER & HOAR LLP
Exchange Place
Boston, MA 02109
(617) 570-1000

OF COUNSEL:

David B. Tulchin
SULLIVAN & CROMWELL
125 Broad Street
New York, New York 10004
(212) 558-4000

Charles B. Casper
MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP
123 South Broad Street
Philadelphia, Pennsylvania 19109
(215) 772-1500

19